IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

  v.                                  CRIMINAL NO. 1:17CR71
                                         (Judge Keeley)

**MEYLAN MONTALVO GOMEZ,**
**NAUDI REYES FERNANDEZ,**
**YOSAN PONS SOSA, AND**
**LAZARO SERRANO DIAZ,**

      **Defendants.**

## MEMORANDUM OPINION OVERRULING THE
## DEFENDANTS' OBJECTIONS TO THE PRESENTENCE REPORTS

After receiving their presentence reports, each of the four defendants, Meylan Montalvo Gomez ("Gomez"), Naudi Reyes Fernandez ("Fernandez"), Yosan Pons Sosa ("Sosa"), and Lazaro Serrano Diaz ("Diaz") (collectively, "the defendants"), objected to the probation officers' loss calculation of $550,000 to $1,500,000, with a resulting 14-level enhancement to the base offense level under USSG § 2B1.1(b)(1)(H) (Dkt. Nos. 231 at 34, 37-41; 233 at 36, 38-42; 235 at 37-38, 39-41; 237 at 35-36, 39-40).[1] At the joint sentencing hearing held on October 3, 2018, the Court heard extensive argument on this issue, overruled the objections, and applied the 14-level enhancement under § 2B1.1(b)(1)(H) to each of the defendants. This memorandum opinion discusses the basis for that ruling.

---

[1] Although Diaz filed four objections to the PSR, three of those objections disputed the proposed calculation of loss under § 2B1.1(b)(1)(H), and the fourth objection is not at issue here.

**USA V. GOMEZ, et al.**                                                          **1:17CR71**

**MEMORANDUM OPINION OVERRULING THE**
**DEFENDANTS' OBJECTIONS TO THE PRESENTENCE REPORTS**

## I. Background

**A.    Procedural History**

On December 5, 2017, a grand jury sitting in the Northern District of West Virginia returned a six-count indictment against the defendants, naming each in two counts (Dkt. No. 6). Gomez was named in Counts One and Four, charging her with Conspiracy to Commit Access Device Fraud, in violation of 18 U.S.C. § 1029(b)(2), and Access Device Fraud - Use of Unauthorized Access Device, in violation of 18 U.S.C. §§ 1029(a)(2) and (c). Id. at 1-7, 10. Fernandez was named in Counts One and Two, charging him with Conspiracy to Commit Access Device Fraud, in violation of 18 U.S.C. § 1029(b)(2), and Access Device Fraud - Possession of Device-Making Equipment, in violation of 18 U.S.C. §§ 1029(a)(4) and (c). Id. at 1-8. Sosa was named in Counts One and Three, charging him with Conspiracy to Commit Access Device Fraud, in violation of 18 U.S.C. § 1029(b)(2), and Access Device Fraud - Use of Unauthorized Access Device, in violation of 18 U.S.C. §§ 1029(a)(2) and (c). Id. at 1-7, 9. Diaz was named in Counts One and Six, charging him with Conspiracy to Commit Access Device Fraud, in violation of 18 U.S.C. § 1029(b)(2), and Access Device Fraud - Use of Unauthorized Access Device, in violation of 18 U.S.C. §§ 1029(a)(2) and (c). Id. at 1-7, 12.

**MEMORANDUM OPINION OVERRULING THE
DEFENDANTS' OBJECTIONS TO THE PRESENTENCE REPORTS**

Gomez, Fernandez, and Diaz were detained pending trial (Dkt Nos. 63, 67, 97). Sosa, although initially placed on pretrial supervision with conditions of release (Dkt. Nos. 66, 69), violated his conditions and, ultimately, was also detained pending trial (Dkt. No. 132).

On June 4, 2018, the defendants each pleaded guilty without plea agreements to the charges in the indictment (Dkt. Nos. 175, 177, 178, 179). Magistrate Judge Aloi recommended that the Court accept their guilty pleas (Dkt. Nos. 189, 191, 192, 193), which the Court did by orders entered on June 19, 2018 (Dkt. Nos. 198, 199, 201, 202).

**B.  Presentence Reports**

The presentence reports prepared by the probation officers in each case concluded that the defendants were subject to the 14-level enhancement under USSG § 2B1.1(b)(1)(H) because the intended loss was approximately $1,000,000 (Dkt. Nos. 231 at 15-16, 233 at 16-17, 235 at 15-16, 237 at 13-14). The probation officers calculated the intended loss by applying the $500 floor imposed by Section 2B1.1, Application Note 3(F)(i): "In a case involving any . . . unauthorized access device, loss . . . shall be not less than $500.00 per access device." Id. Because approximately 2,000 access devices were found on one of the defendants' laptop computers, they arrived at the intended loss by multiplying 2,000 by $500, for a

total loss of $1,000,000. Id. The presentence reports also explained that using the $500 floor to calculate intended loss was reasonable because many of the defendants' transactions in this case were in the amount of $500 (Dkt. Nos. 231 at 16, 233 at 16, 235 at 16, 237 at 14).

Although the defendants' objections differed slightly, each asserted the same arguments during the joint sentencing hearing, contending that (1) it is unreasonable and speculative to assume that the defendants "could fully monetize the data they obtained"; (2) the potential loss only counts as "intended loss" if he "subjectively desired to cause it" or he "had a subjective expectation that it would result from his conduct"; (3) the $100 floor should apply because the unauthorized access devices were unused and provided "telecommunications access"; and (4) not all 2,022 unauthorized access devices were "usable" because it would be factually impossible to use them all (Dkt. Nos. 231 at 37-41, 233 at 38-42).[2]

In its response to the defendants' objections, the Government argued that the 14-level enhancement is proper because (1) the $500 floor applies to used and unused unauthorized access devices; (2)

---

[2] Because the defendants conceded that the debit and credit card numbers found on the laptop computer satisfy the definition of "unauthorized access device," the Court need not address that argument here.

the unauthorized access devices at issue here do not include "telecommunication identifying information"; (3) the intended loss is not speculative; and (4) the unauthorized access devices were "usable" (Dkt. No. 228).

### III. APPLICABLE LAW

Under USSG § 2B1.1(b)(1)(H), a defendant's sentence is enhanced 14 levels if the amount of loss exceeds $550,000 but is less than $1,500,000. Under Application Note 3(A), "loss is the greater of actual loss or intended loss." Application Note 3(F)(i) sets forth special rules for calculating loss in cases involving stolen or counterfeit credit cards or access devices:

> In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device. However, if the unauthorized access device is a means of telecommunications access that identifies a specific telecommunications instrument or telecommunications account (including an electronic serial number/mobile identification number (ESN/MIN) pair), and that means was only possessed, and not used, during the commission of the offense, loss shall be not less than $100 per unused means.

U.S.S.G. § 2B1.1(b)(1)'s cmt. n.3(A)(I).

5

## IV. DISCUSSION

After reviewing the defendants' objections and the parties' sentencing memoranda, the Court concludes that the $500 floor imposed by Application Note 3(F)(i) applies for four reasons.

### A.  Application Note 3(F)(i) does not require use.

*First,* "nothing in the text requires the access devices to be actually <u>used</u>." <u>United States v. Cardenas</u>, 598 F. App'x 264, 267 (5th Cir. 2015) (emphasis in original). Indeed, Note 3(F)(i) sets forth two characteristics for calculating loss: "[L]oss [(1)] includes any unauthorized charges made with the counterfeit access device or unauthorized access device <u>and</u> [(2)] shall be not less than $500 per access device." (emphasis added). "The commentary does not require unauthorized charges just because that phrase appears first. Instead, the case can involve 'any counterfeit access device or unauthorized access device.'" <u>Cardenas</u>, 598 F. App'x at 267 (quoting Note 3(F)(i)).

Moreover, the second sentence of Note 3(F)(i) "shows that 'the authors of the Guidelines knew how to limit the application of these provisions to the use of access devices.'" <u>United States v. Thomas</u>, 841 F.3d 760, 764 (8th Cir. 2016) (quoting <u>Cardenas</u>, 598 F. App'x at 267). "If 'any counterfeit access device or unauthorized access device' were intended to include only devices that had been actually used, there would have been no need to explain how to

6

treat unused unauthorized access devices because such devices would have been 'outside the ambit of the provision.'" Id. (quoting same).

Every circuit court to address this question has concluded that the $500 floor created by Note 3(F)(i) applies to "all access devices that the defendant possessed, whether or not used." United State v. Popovski, 872 F.3d 552, 553 (7th Cir. 2017) (citation omitted); see also United States v. Moon, 808 F.3d 1085, 1091 (6th Cir. 2015) (compiling cases); United States v. Balde, 616 F. App'x 578, 583–84 (4th Cir. June 18, 2015) (finding no error when the district court calculated loss using the $500 floor under Note 3(F)(i) "for every number recovered and related to the conspiracy"); United States v. Mendez, 589 F. App'x 642, 645 (4th Cir. 2014) (finding no error when "the court used the $500-per-device multiplier in accordance with USSG § 2B1.1 cmt. n. 3(F)(i), resulting in a loss that reflected both the loss from used cards and the reasonably foreseeable loss from unused cards").

The Ninth Circuit's decision in United States v. Onyesoh, 674 F.3d 1157 (9th Cir. 2012), does not suggest otherwise. There, the court held that the $500 floor only could be used to calculate loss for unauthorized access devices that were "usable." Onyesoh, 674 F.3d at 1159. The court explained that there was no evidence showing that expired credit card numbers could be used, and, if

7

they could not be used, they could not serve as a basis for calculating intended loss. Id. Although this reasoning ignores the definition of "intended loss" (which includes pecuniary harm that is impossible or unlikely to occur) and "unauthorized access device" (which includes any access device that is expired, revoked, or canceled), Onyesoh did not conclude that the $500 floor could apply only to unauthorized access devices that were used during the commission of the crime. Id.; see also 18 U.S.C. § 1029(e)(3) (defining "access device" as "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud"); U.S.S.G. § 2B1.1(b)(1)'s cmt. n.3(A)(ii) (defining "intended loss" as "pecuniary harm that would have been impossible or unlikely to occur").

Practically speaking, it makes no sense to require actual use of unauthorized access devices to calculate intended loss because unauthorized access devices used during the commission of a crime would be used to calculate actual loss—not intended loss. See U.S.S.G. § 2B1.1(b)(1)'s cmt. n.3(A). In other words, requiring use to calculate intended loss would make the definition of intended loss superfluous. Accordingly, this Court concludes that the $500 floor created by Note 3(F)(i) applies to "all access devices that the defendant possessed, whether or not used." Popovski, 872 F.3d at 553.

8

**B. The unauthorized access devices do not provide "telecommunications access."**

*Second,* the debit and credit card information found on the defendants' laptop did not provide "telecommunications access," qualifying it for the $100 floor under Note 3(F)(i). The $100 floor imposed by the latter half of Note 3(F)(i) only applies "if the unauthorized access device is a means of telecommunications access that identifies a specific telecommunications instrument or telecommunications account . . . ." U.S.S.G. § 2B1.1(b)(1)'s cmt. n.3(F)(i). Here, there is no evidence to suggest that the numbers found on the defendants' laptop "identified specific telecommunications instrument[s] or telecommunications account[s]" that also gave them "access" to some telecommunication service or network. Although those terms are not defined, their meaning can be gleaned from the definition of "counterfeit access device," which "includes a telecommunications instrument that has been modified or altered to obtain unauthorized use of telecommunications service." U.S.S.G. § 2B1.1(b)(1)'s cmt. n.10(A). Note 10(A) says that "telecommunication service" has the meaning given to the term in 18 U.S.C. § 1029(e)(9). Id. Furthermore, section 1029(e)(9) directs readers to the definition in 47 U.S.C. § 153. There, "[t]he term 'telecommunications service' means the offering of telecommunications for a fee directly to the public, or to such

classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(53).

Based on the definitions of "counterfeit access device" and "telecommunications service," it is hard to conclude that the $100 floor applies to anything but unused, unauthorized access devices that (1) identify specific telecommunications instruments or accounts, <u>and</u> (2) provide access to telecommunications. See U.S.S.G. § 2B1.1(b)(1)'s cmt. n.3(A)(i). This understanding is further confirmed by what the Government points out as the definition of "telecommunication identifying information," which means an "electronic serial number or any other number or signal that identifies a specific telecommunications instrument or account, or a specific communication transmitted from a telecommunications instrument" (Dkt. No. 228 at 4 (quoting 18 U.S.C. § 1029(e)(11))).

Critically, here, there simply is no evidence that the unused, unauthorized access devices found in the defendants' possession had anything to do with obtaining unauthorized telecommunications service or access, let alone the requisite telecommunication identifying information. Instead, the devices gave the defendants access to bank and credit card accounts that they could use for unauthorized purchases and financial transactions.

**C.   The unauthorized access devices were "usable."**

*Third,* the 2,022 unauthorized access devices found on the defendants' laptop were "usable." As the Ninth Circuit held in <u>Onyesoh</u>, the $500 floor could only be used to calculate loss for unauthorized access devices that were "usable." 674 F.3d at 1159. The defendants argue that not all of the unauthorized access devices found on their laptop were "usable" because they did not have the time to use them even had they wanted to. This argument lacks merit for two reasons.

First, although this Court is not bound by the Ninth Circuit's holding in <u>Onyesoh</u>, there is no evidence to suggest that the 2,022 unauthorized access devices found on the defendants' laptop were not "usable" because they were expired or canceled. Morever, the defendants' decision to limit their fraud scheme to debit card numbers does not, in turn, make the stolen credit card numbers unusable.

Second, even if the unauthorized access devices were not "usable" according to <u>Onyesoh</u>, the Court would still conclude that the $500 floor imposed by Note 3(F)(i) would apply because the definition of "access device" includes devices that are expired, revoked, or canceled, and the definition of intended loss plainly includes pecuniary harm that would be impossible to occur. <u>See</u> 18 U.S.C. § 1029(e)(3) (defining "access device" as "any access device

that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud"); and U.S.S.G. § 2B1.1(b)(1)'s cmt. n.3(A)(ii) (defining "intended loss" as "pecuniary harm that would have been impossible or unlikely to occur").

**D.   The $500 floor is reasonable.**

*Fourth*, it is reasonable to calculate intended loss using the $500 floor per unused device. The text of Application Note 3(A)(ii) is dispositive as to this issue:

> "intended loss" (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been <u>impossible or unlikely to occur</u> (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

U.S.S.G. § 2B1.1(b)(1)'s cmt. n.3(A)(ii) (emphasis added).

Here, Fernandez and his co-defendants sought to inflict pecuniary harm by using multiple skimming devices to scan thousands of debit and credit cards used at numerous gas station pumps, downloading that card information to a laptop via bluetooth, and transferring it to cards that could be used to make unauthorized purchases or other financial transactions. The definition of "intended loss" includes pecuniary harm that was impossible or unlikely to occur. Id.

Moreover, using $500 to calculate intended loss is plainly reasonable. For example, the defendants in this case executed 40

Western Union money orders and 15 (of 17) MoneyGram money orders for $500 each (PSR at 14). Further, they purchased 81 gift cards from various Kroger locations, each for $500. Id.

Therefore, because the definition of intended loss includes pecuniary harm that would have been impossible or unlikely to occur, and because of the defendants' criminal conduct in this case, it is reasonable to calculate the intended loss by using $500 per unused number found on the defendants' laptop computer.

## IV. CONCLUSION

The $500 floor imposed by Application Note 3(F)(i) applies to all 2,022 unauthorized access device numbers found on the laptop, requiring the 14-level enhancement required under § 2B1.1(b)(1)(H). The Court therefore **OVERRULES** the defendants' objections to the 14-level enhancement under § 2B1.1(b)(1)(H) and **DIRECTS** the Clerk to transmit copies of this Order to counsel of record and all appropriate agencies.

It is so **ORDERED**.

DATED: October 11, 2018.

>                              /s/ Irene M. Keeley
>                              IRENE M. KEELEY
>                              UNITED STATES DISTRICT JUDGE